# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **LOADMAN GROUP, L.L.C., et al.,** | ) | **CASE NO. 4:10cv1759** |
| | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | **JUDGE SARA LIOI** |
| **vs.** | ) | |
| | ) | |
| | ) | **MEMORANDUM OPINION** |
| **BANCO POPULAR NORTH AMERICA,** | ) | **AND ORDER** |
| | ) | **(Resolving Doc. No. 35)** |
| | ) | |
| **DEFENDANT.** | ) | |

Before the Court is defendant's motion for summary judgment (Doc. No. 35), plaintiffs' opposition (Doc. No. 45), and defendant's reply (Doc. No. 51). For the reasons discussed below, the Court **GRANTS** defendant's motion for summary judgment.

## I.    BACKGROUND

### A.  Procedural History

On August 10, 2010, Loadman Group, L.L.C. ("Loadman Group") and Eric J. Loadman ("Loadman") filed a complaint based on diversity jurisdiction against defendant Banco Popular North America ("defendant" or "Banco"). (Doc. No. 1.) The complaint alleged various state law claims stemming from Banco's decision not to close on a Small Business Administration ("SBA") insured loan to Loadman and Loadman Group. (*Id*. at 1.) Loadman and Loadman Group filed an amended complaint on May 3, 2011, alleging claims for breach of oral and written contracts (Count 1),[1] breach of the duty of good faith and fair dealing (Count 2), willful misconduct and intentional misrepresentation (Count 3), intentional infliction of

---

[1] Count 1 of the amended complaint is divided into three subparts (A, B, and C). Count 1(A) alleges breach of an oral contract promising no undue delay in closing. (Doc. No. 19 at 155.) Count 1(B) alleges breach of an oral promise with regard to satisfaction of certain environmental conditions. (*Id*. at 156.) Count 1(C) alleges breach of a written contract arising from a loan commitment letter. (*Id*. at 157.)

emotional distress (Count 4), and negligent misrepresentation (Count 5). (Doc. No. 19.) Plaintiffs seek compensatory and punitive damages, interest, costs, and attorney's fees.

On July 26, 2011, Loadman filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Northern District of Georgia.[2] On April 2, 2012, Banco moved for summary judgment, arguing, in part, that in light of the bankruptcy filing, plaintiffs lacked standing to pursue their claims in this Court. In their opposition to summary judgment, plaintiffs conceded Loadman no longer had standing to pursue this action, but argued substitution of the bankruptcy trustee would remedy the defect.

On June 13, 2012, the bankruptcy court granted a motion by the bankruptcy trustee to employ plaintiffs' counsel in this action as special counsel to the trustee to pursue Loadman's claims pending before this Court. (Doc. No. 48-1 at 1561.) On July 3, 2012, this Court granted plaintiffs' unopposed motion to substitute Tamara Miles Ogier, Trustee ("Trustee"), as a party plaintiff in place of plaintiff Loadman and deemed the previously filed opposition brief to summary judgment as filed by the Trustee and Loadman Group (collectively "plaintiffs").[3] The parties thereafter completed briefing on the summary judgment motion, which included two additional motions by defendant: one (Doc. No. 52) to strike the affidavit of Loadman that plaintiffs attached to their opposition, and another (Doc. No. 53) to strike the affidavit of Frank Coco ("Coco") that plaintiffs attached to their opposition and the supplemental

---

[2] In his bankruptcy, Loadman listed his co-plaintiff in this action, Loadman Group, as a corporation in which he had ownership, but indicated it had no assets. On Schedule B, he listed this lawsuit as an asset or potential asset of his estate.

[3] In light of the substitution of the Trustee, to the extent the present motion seeks summary judgment on the grounds that Loadman lacks standing to pursue this action, that portion of the motion is **DENIED as MOOT**. *See Doughtie v. Ashland, Inc.*, No. 03-2073 M1/A, 2005 WL 1140736 (W.D. Tenn. May 12, 2005) (substitution of bankruptcy trustee for named plaintiff mooted standing issue).

affidavit from Coco that plaintiffs sought leave to file. In a Memorandum Opinion and Order filed contemporaneously with this Memorandum Opinion and Order (Doc. No. 64), the Court granted plaintiff leave to file Coco's supplemental affidavit, construed defendant's motions to strike as objections pursuant to Rule 56, and sustained defendant's objections in part. Defendant's motion for summary judgment is now ripe for disposition.

### B.  Factual Background

In 2007, Loadman became interested in purchasing Allred Metal Stamping Works, Inc. ("Allred Metal"), a metal stamping business located in North Carolina. (Doc. No. 37 [Loadman Dep. April 1, 2011] at 715.) He retained Frank Coco ("Coco") as his financial advisor and, in late 2007, they approached Joe Wojtowicz ("Wojtowicz") of Banco about obtaining the SBA loans for the purchase. (*Id*. at 694, 710, 713, 745.) The loans were conditioned upon the environmental status of two adjacent parcels of real estate on which Allred Metal was located: 1305 Old Thomasville Road ("Old Thomasville Road property") and 1990 Bethel Drive ("Bethel Drive property"). As early as January 3, 2008, an environmental risk assessment, or Phase I inspection, had indicated there could be environmental problems on both properties, requiring a follow-up Phase II assessment. (*Id*. at 723-24, 734, 736.)

On February 7, 2008, Banco issued a loan prequalification letter to Loadman for an SBA real estate acquisition loan. (*Id*. at 745-46; Doc. No. 35-1 [Loadman Dep. Ex. F] at 331.) The letter explained that Loadman's request for financing had been pre-qualified for the SBA "504 program." (Doc. No. 37 at 748; Doc. No. 35-1 at 331.) The letter further explained that the SBA "504 program" is a co-lending program wherein a lender makes a first mortgage, and the SBA provides a second mortgage, via the services of a Certified Development Company

("CDC"). (Doc. No. 37 at 748-49; Doc. No. 35-1 at 331.) The purpose for the CDC's involvement was to work with the lender and the SBA to handle the SBA loan application approval and documentation process for the second mortgage to the lender. (Doc. No. 37 at 749-50, 755.) Loadman testified he understood the letter was a nonbinding proposal, not a commitment to lend, and that it did not contain all of the terms and conditions of the loan. (Doc. No. 37 at 755.)[4] He accepted the proposal on February 27, 2008. (*Id*.; Doc. No. 35-1 at 333.)

In March 2008, Loadman sought alternative financing from another bank because he felt Banco was taking too long. (Doc. No. 37 at 717.) He returned to Banco, however, after a conversation with Wojtowicz and Banco's Matthew Putnam ("Putnam"), in which he asserts they promised lower interest rates and fees and that the loan would close within 20 to 30 days. (*Id*. at 728-30, 764.) Coco, Loadman's financial advisor, participated in that conversation as well, but he testified Putnam did not promise anything with regard to how fast or slow the loan would close, promising only his "best effort." (Doc. No. 39 [Coco Dep.] at 1224-25.) Coco testified Wojtowicz had no authority to decide if a loan would close at all and that he explained this to Loadman. (*Id*. at 1215.)

On April 9, 2008, Banco sent Loadman a commitment letter. (Doc. No. 37 at 756; Doc. No. 35-1 [Loadman Dep. Ex. G] at 336.) In it, Banco offered Loadman and his "Corporation to be Formed," "at the Bank's sole discretion, the following credit facility which is

---

[4] The letter states as follows:

> This proposal is for discussion purposes only. It does not represent a commitment to lend on the part of the Lender. If the proposal meets with your approval, it is then subject to credit approval by the Lender and the SBA, and the execution and delivery of all documents and information required by the Lender and the SBA in form and substance satisfactory to the Lender and the SBA.

(Doc. No. 35-1 at 332.)

subject to, but not limited to, the terms and conditions set forth herein." (Doc. No. 35-1 at 336.) The letter proposed two first mortgage "504" loans, two second "504" "bridge" loans to be repaid by the SBA, and one SBA 7(a) loan. (*Id*. at 336-46.) The letter referenced "[a]dditional loan requirements" attached as a "Closing Needs Checklist" ("checklist"),[5] which included certain conditions that would need to be satisfied prior to loan closing.[6] (*Id*.)

On April 11, 2008, a nearly identical commitment letter superseded the April 9 commitment letter. (Doc. No. 37 at 761; Doc. No. 35-1 [Loadman Dep. Ex. H] at 358.) A July 31, 2008 commitment letter eventually superseded the April 11 letter; it identified the "Corporation to be Formed" as Loadman Group, but was otherwise essentially identical to the prior letter. (Doc. No. 37 at 772-73; Doc. No. 35-1 [Loadman Dep. Ex. I] at 375.) Loadman accepted the terms of each of those letters. (Doc. No. 37 at 757, 761-62.)

---

[5] The commitment letter stated, in relevant part:

> 9. . . . Additional loan requirements are attached to this commitment letter as "Closing Needs Checklist." These requirements are based on initial documentation received with your loan application. Additional conditions may be required as the loan closing process proceeds.
> . . .
> **10. This loan is further subject to Bank receipt and approval, in its sole discretion, of a fully executed SBA Authorization for Debenture Guaranty. The Borrower(s) and Guarantor(s) agree to provide any additional information as required pursuant to the program and have full knowledge that the proposed loans cannot close without receipt of a fully executed SBA Authorization for Debenture Guaranty.**

(Doc. No. 35-1 at 347) (bold in original).

[6] The checklist included the following pertinent conditions:

> 13._____ Satisfactory Environmental site assessment starting with a Phase II located at 1305 Old Thomasville Road, High Point, North Carolina 27260. (DONE)
> 14._____ Satisfactory Environmental site assessment starting with a Phase II located at 1990 Bethel Drive, High Point, North Carolina 27260
> . . .
> 18._____ Closing, [sic] of the loan is conditioned upon prior receipt and review of fully executed SBA Authorization for Debenture Guarantee from an acceptable CDC.
> 19._____ SBA Loan Authorization

(Doc. No. 35-1 at 356-57.)

5

As described in the February 7, 2008 prequalification letter, throughout this process, it was the role of the CDC to obtain SBA approval of the 504 loans. (Doc. No. 37 at 751.) The CDC representative working on Loadman's loans was Ralph Ansell ("Ansell") of the CDC Self-Help Ventures Fund. (*Id*. at 752, 833; Doc. No. 38 at [Ansell Dep.] 980.) Ansell testified that the SBA's 504 loan program required use of an intermediary CDC, but CDCs do not have the authority to speak for the SBA, which has the "final say" on approving loans and could impose additional conditions. (Doc. No. 38 at 980-81, 987-88, 992.)[7] He further stated that a 504 loan needed approval from the CDC's credit committee before submission to the SBA. (*Id*. at 1005.)[8]

In or around May or June 2008, a Phase II environmental assessment was performed on the real estate. (Loadman Dep. Feb. 21, 2012, Doc. No. 40 at 1356, 1377; Burkart Aff., Doc. No. 45-3 at 1468.) During the course of the Phase II investigation, petroleum was found in the soil of the Old Thomasville Road property. (Doc. No. 37 at 813-14.) That contamination required specific steps toward remediation. (*Id*. at 902; Doc. No. 39 at 1248; Doc. No. 40 at 1358.)[9]

---

[7] Loadman testified, however, that he believed Ansell spoke for the SBA and that Ansell had told him the SBA had approved the 504 loans. (Doc. No. 37 at 800, 833, 916.)

[8] In contrast, Ansell stated that an SBA 7(a) loan allowed a bank with a Preferred Lender Program ("PLP") status to bind the SBA directly rather than going through a CDC. (Doc. No. 38 at 987-88, 991.) In a transaction involving both types of loans, however, he indicated that a lender would typically process them together to avoid situations in which one was approved while the other was denied. (*Id*. at 990.)

[9] John Burkart ("Burkart"), an environmental expert from LandAmerica who worked with Allred Metal on a remediation plan, summarized those steps in an email to Allred Metal, as follows:

> 1. Completion of the LSA [Limited Site Assessment] report maybe near August 2008 since we must get all the certified mail to all the property owners within 1500 feet of the site. We are working on getting all this info right now.
> 2. The site will be listed with NCDENR [North Carolina Department of Environmental and Natural Resources] as a high risk site due to water supply wells adjacent to the site.
> 3. Therefore a Comprehensive Site Assessment (CSA) or Phase II LSA must be completed next[.]

6

Beginning July 4, 2008 through August 4, 2008, Banco provided Loadman with four updated checklists of documents that still needed to be obtained prior to the loan closing, including completion of a satisfactory environmental Phase II assessment for both properties.[10] (Doc. No. 37 at 780-81, 797-801, 808; Doc. No. 35-1 at 390, 399, 408, 417.)

As of August 4, 2008, the date of the last checklist, there still was no site closure letter from the state environmental agency, no SBA approval, and Banco had not waived either condition. (Doc. No. 37 at 809.) In an August 5, 2008 email, Ansell explained to Banco what was needed before the loans could be presented to the CDC's own credit committee. The necessary items included a state approved remediation plan and escrow by Allred Metal sufficient to cover the costs of that remediation, the amount of which would need to be approved

---

this [sic] involves more monitoring wells and sampling to verify the plume configuration at the site.
4. Completion of a remedial action plan to reduce the petroleum impact to below NCDENR action level.
5. Monitor the site and eventually obtain closure with NCDENR (could be two years or five years before closure can be granted by NCDENR)[.]

(Doc. No. 37 at 839-40; Doc. No. 35-1 at 426.) Burkart suggested reserving $100,000 to complete the tasks, but qualified that his estimate "may change following completion of the LSA and CSA." (Doc. No. 35-1 at 426.)

[10] Although petroleum was initially found only on the Old Thomasville Road property, Ansell indicated that the CDC and SBA required confirmation that the plume had not migrated to the Bethel Road site. (Doc. No. 38 at 1079-80.) The updated checklists provided, in relevant part, that the following conditions needed to be met prior to loan closing:

13._____ Satisfactory Environmental site assessment starting with a Phase II located at 1305 Old Thomasville Road, High Point, North Carolina 27260. Received – *(Environment issues pending – Escrow for remediation required – Site Closure from NCDENR pending – SBA Approval required)*
14._____ Satisfactory Environmental site assessment starting with a Phase II located at 1990 Bethel Drive, High Point, North Carolina 27260 Received – *(Environment issues pending – Escrow for remediation required – Site Closure from NCDENR pending – SBA Approval required)*

(Doc. No. 35 at 397-98, 406-07, 415-16, 424-25) (emphasis retained).

7

by the state. (Doc. No. 38 at 1040-43; Doc. No. 35-3 at 478.)[11] Ansell further stated that, "Completion of the CAP [Corrective Action Plan] could take an extended period of time." (Doc. No. 35-3 at 478.) Coco testified that "the burden of remediation is on the borrower[,]" but that, in this case, the seller, Allred Metal, had accepted that burden, among others. (Doc. No. 39 at 1250.) Loadman testified that no one ever asked *him* for any of the additional documents that Ansell identified in his email to Banco and that, instead, Banco told him all he needed to do to obtain CDC and SBA approval was to have an indemnity agreement in place and funds in escrow sufficient to cover the costs of remediation. (Doc. No. 37 at 794.)

On or about August 11, 2008, Banco's Diane Gallion ("Gallion") issued a letter to Loadman denying the loans due to his "inability to meet the conditions" of the original commitment letter, which included the requirement that the property be free of environmental contamination and acceptable to Banco and the SBA. (Doc. No. 37 at 856-57; Doc. No. 35-1 at 427.) She noted that, according to the environmental expert retained by Allred Metal, remediation could take years and, due to that timeframe and the associated risk, Banco could not close the loan. (*Id.*) She stated, "These decisions are based on both the Bank and the regulations for the SBA 504 program." (*Id.*)[12]

---

[11] Ansell stated that the CDC would not even consider funding the 504 loans until: 1) the LSA was completed and submitted to the NCDENR; 2) the NCDENR issued its official risk classification; 3) the CSA was completed and submitted to the NCDENR and a follow up risk classification determined by the NCDENR; 4) assuming the risk classification remained "high or intermediate," preparation of a Corrective Action Plan ("CAP") officially quantifying the projected remediation costs and schedule, which must then be submitted to, and approved by, the NCDENR; 5) escrow by the sellers of 150% of the remediation cost as "quantified in the CAP" and "approved by the NCDENR"; and 6) execution of an SBA indemnification agreement by the sellers. (Doc. No. 35-3 at 478.)

[12] Gallion testified that, based on her experience, she knew any letter issued by the SBA would provide a caveat that any adverse change affecting the business could cause the SBA not to pay off the bridge loans. (Doc. No. 36 [Gallion Dep.] at 671.) She testified that an adverse change was not limited to environmental concerns, but could be potentially anything, including changes in "personal, business, or affiliated industries, the companies they own, their financial condition, their structure, change in the market value of the property, anything that was germane to the original credit decision." (*Id.* at 629-30.) If the SBA determined that there was such a change, it could "choose not to

8

On or about August 13, 2008, Gallion proposed a possible alternative method whereby Loadman could lease the real estate until the remediation was completed, at which time a new loan could be pursued for the real estate. (Doc. No. 35-1 at 428-29; Doc. No. 37 at 860-61.)[13] Loadman testified it was his understanding that the lease alternative was intended "to expedite [sic] [the process] rather than waiting for all the other things to happen." (Doc. No. 37 at 860.)

Loadman testified that, as late as August 14, 2008, however, Banco's in-house attorney, Kristina Rozek ("Rozek"), Banco's Wojtowicz, and the CDC's Ansell each assured him the original deal could still go forward, so long as he obtained a remediation plan, indemnity agreement, and escrow. (*Id*. at 869.) According to Loadman, Ansell purportedly further assured him that the SBA would not have a problem lending to him even without a "no further action letter" from the state. (*Id*. at 919.) Additionally, according to Loadman, Rozek told him she was in charge of the closing, the closing was happening, and Gallion had no right to cancel the loan. (*Id*.)

On August 19, 2008, Loadman emailed to Ansell and Banco a draft Limited Site Assessment ("LSA") report prepared by Allred Metal's environmental expert. Loadman stated

---

participate," leaving Banco "at risk until the SBA wires money." (*Id.*) In this case, she indicated that the remediation was "a big concern" because of all the unknowns associated with it, and because the lengthy time required increased the prospect that an adverse change would occur, potentially leaving Banco fully at risk. (*Id*. at 631, 659.) She explained that she and Banco operated in "minimizing, reducing, or eliminating anything that's a risk," and, for that reason, they would not close loans where there was an unquantifiable risk that could prevent the SBA's participation. (*Id*. at 669.)

Ansell agreed with Gallion's assessment, testifying that, in most instances, the SBA would want to have the remediation completed and a "no further action letter" from the state. (Doc. No. 38 at 1087-88.) In the "very unlikely" event that the loan was approved prior to remediation, there was "no way" the funds would be dispersed. (*Id*. at 1051-52.) He stated that was "a real risk for a lender" because it could "end[ ] up with the entire deal" if something happened to make the SBA decide not to pay off the bank. (*Id*. at 1051-52, 1085-86.)

[13] Regarding that suggestion, Ansell testified that both "the bank and the CDC were looking for ways to do the deal in the light of the environmental consideration." (Doc. No. 38 at 1048.)

that he wanted to purchase the Bethel Drive property because the draft LSA said it was clean. (Doc. No. 38 at 1052-53; Doc. No. 35-3 at 482.)[14]

On August 25, 2008, Banco again explained to Loadman that it would not proceed with any real estate loan because of the environmental issues, but if he wanted to lease the property, he should provide the lease terms. (Doc. No. 37 at 863; Doc. No. 35-1 at 430-31.) A few days later, Gallion explained the "current loan is withdrawn. If you put a new deal together we will respectfully consider." (Doc. No. 37 at 876; Doc. No. 35-1 at 432.) Loadman never submitted anything to Banco showing he had obtained lease agreements or alternative financing for the real estate. (Doc. No. 37 at 877.) Furthermore, through the end of August 2008, the state had not approved a comprehensive site assessment, a corrective action plan, or the length of time, extent, and cost of remediation. (Doc. No. 35-5 at 499.)

According to Ansell, plaintiffs also failed to meet other loan conditions, including a fully executed authorization for debenture guarantee from the CDC and SBA approval. Ansell testified that because of the failure to meet these conditions, the loans were never submitted to the SBA for approval and were never submitted to the CDC's credit committee. (Doc. No. 38 at 977-79, 1005, 1007.)[15] Subsequently, Loadman bought into another company but was unsuccessful, leaving him with personal debts. (Doc. No. 40 [Loadman Dep. II] at 1348-51.) He then filed this action in August 2010 against Banco.

---

[14] Both Banco and Ansell noted that the draft LSA did not, in fact, declare Bethel Drive clean. (Doc. No. 38 at 1049-50; Doc. No. 35-3 at 483.) Ansell added: "I don't believe SBA will approve anything until the Comprehensive Site Assessment (CSA) is performed and the extent of the contamination is known to include a determination about whether the Bethel property has been impacted and what the likely cost of remediation might be." (Doc. No. 35-3 at 483.)

[15] Ansell testified, "We never were able to get full information about the environmental condition of the property. . . . [W]e never could get a full accounting of just how serious that problem was." (Doc. No. 38 at 978-79.) "You know, the thing I would not want to do as a CDC would be to submit a case to the SBA which has unresolved issues." (Id. at 1006.)

## II.    LAW AND ANALYSIS

### A.  Summary Judgment Standard of Review

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

The party opposing the motion may not rely merely on allegations or denials in its own pleading; rather, by affidavits or materials in the record, they must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of an essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Rule 56(c)(4) requires "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Mere conclusory allegations "are not evidence and are not adequate to support a motion for summary

11

judgment." *Miller v. Aladdin Temp–Rite, LLC*, 72 F. App'x 378, 380 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (*citing Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show there is some metaphysical doubt as to material facts. *Id.*

In ruling on a motion for summary judgment, the court may not take into account credibility, the weight of the evidence, or the drawing of inferences from the facts. *Anderson*, 477 U.S. at 255. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is improper. *Id.* at 248. Accordingly, for the purposes of deciding this motion, and where communicated properly under Rule 56, plaintiffs' account of the facts must be accepted as true.

### B.  Consent to Summary Judgment

In the first amended complaint, plaintiffs assert nine claims against defendant. In response to defendant's motion for summary judgment, plaintiffs consent to summary judgment on six of the nine claims, as follows: Count 1(B) alleging an oral contract created by Rozak's representations, Count 2 alleging breach of the duty of good faith and fair dealing, Count 3 alleging willful misconduct and intentional misrepresentation, Count 4 alleging intentional infliction of emotional distress, and Count 5 alleging negligent misrepresentation. By failing to dispute (and actually consenting to) Banco's motion for summary judgment as to these claims and the materials offered in support thereof, plaintiffs have not carried their burden under Rule 56(c) and, therefore, defendant is entitled to summary judgment on these claims. *Travelers Cas. & Sur. Co. of Am. v. J.O.A. Const. Co., Inc.*, 479 F. App'x 684, 692 (6th Cir. 2012) (citing Fed. R. Civ. P. 56(e)(2)–(3)). Accordingly, defendant's motion for summary judgment as to these claims is **GRANTED**.[16] All that remains therefore for the Court's analysis are defendant's arguments respecting plaintiffs' remaining claims for breach of contract (Counts 1(A) and 1(C)) and for promissory estoppel, alleged in paragraph 58 of plaintiffs' first amended complaint.

### C.  Plaintiffs Have Not Carried Their Burden as to Damages

Defendant moves for summary judgment as to plaintiffs' breach of contract claims (Counts 1(A) and 1(C)) on the grounds that, without expert testimony (which plaintiffs have failed to offer) (Doc. No. 35 at 260), plaintiffs cannot establish with reasonable certainty their claimed "equity/profit" damages resulting from their inability to purchase Allred Metal.

---

[16]At page 1427 of their opposition brief, plaintiffs also purport to consent to summary judgment as to their "alternative" promissory estoppel claim; however, at page 1453, plaintiffs argue against summary judgment on this claim. Accordingly, given plaintiffs' equivocation, the Court will address this claim *infra*.

Plaintiffs respond that since Banco was ready to lend Loadman "$6 million based on its own due diligence reports, [which] were in turn based on independent appraisals of Allred Metal Stamping's assets[,]" Banco cannot now claim those estimates are speculative or that a jury could not reasonably find that Loadman's "lost equity" on the day of closing fell between $4 million and $10 million. (Doc. No. 45 at 1454.) Further, plaintiffs assert they will prove damages by calling Kozak at trial. (*Id*.)

"In this diversity case, Ohio law determines the elements of damages [that] plaintiffs must prove, and the quantum and type of evidence necessary to prove them." *Anchor v. O'Toole*, 94 F.3d 1014, 1020 (6th Cir. 1996) (citation omitted). To establish a breach of contract claim in Ohio, a plaintiff must prove the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *Savedoff v. Access Grp.,* 524 F.3d 754, 762 (6th Cir. 2008). "Damages are an essential element of a breach of contract claim." *Oak Rubber Co. v. Bank One, N.A.*, 214 F. Supp. 2d 820, 831 (N.D. Ohio 2002) (granting summary judgment on breach of contract claim where there was no evidence of damages) (citing *Doner v. Snapp*, 98 Ohio App. 3d 597, 600–01 (Ohio Ct. App. 1994); *Anchor*, 94 F.3d at 1020 (6th Cir. 1996)). Once challenged on summary judgment, a plaintiff must come forward with competent, credible evidence to create a question of fact as to the existence of damages. *Beemes v. Public Emps. Ret. Sys.*, 102 Ohio App. 3d 782, 789–90 (Ohio Ct. App. 1995).

> As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally, courts have required greater certainty in the proof of damages for breach of contract than in tort. . . . The damages awarded for a breach of contract should place the injured party in as good a position as it would have been in but for the breach. Such compensatory damages, often termed expectation damages, are limited to actual loss, which loss must be established with reasonable certainty.

14

*Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 144 (Ohio Ct. App. 1996) (internal quotation marks and citations omitted). *See also Moriarty v. Equisearch Servs., Inc.*, 443 F. App'x 64, 66-67 (6th Cir. 2011) (citing *Textron*, 115 Ohio App. 3d at 137, and affirming district court's grant of summary judgment where plaintiff failed to prove damages).

> To successfully assert a claim for lost profits, a plaintiff must demonstrate that the profits were within the contemplation of the parties at the time of execution, that the loss of profits is the reasonable result of the breach, and that the profits are not remote and speculative. . . . There must be more than a conclusory statement as to the amount of lost profits. An explanation of how that sum was determined is required. Lost profits must be substantiated by calculations based on facts available or in evidence[;] otherwise they are speculative and uncertain.

*Textron*, 115 Ohio App. 3d at 146 (internal quotation marks and citations omitted).

Here, plaintiffs' proof of damages rests entirely on the affidavits of Loadman and Coco, which, as discussed in the Court's ruling on defendant's objections thereto (*see* Memorandum Opinion and Order at Doc. No. 64), must, in relevant part, be disregarded on summary judgment as speculative, not based on personal knowledge, not based on evidence in the record, inadmissible hearsay, and improper lay opinion testimony. Moreover, the memo presented as an exhibit to Coco's affidavit—prepared in large part by Kozak—contains various charts, graphs, and figures, but does not state the equity value of Allred Metal, nor do plaintiffs offer deposition or affidavit testimony from Kozak, or any other admissible evidence, to explain the purpose of the memo or otherwise explain the calculations contained therein. Further, the memo is admittedly a summary of information obtained from third party source documents not in the record. Consequently, any calculations derived therefrom are merely speculative. *See JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 525 (6th Cir. 2004). Accordingly, because plaintiff has failed to offer sufficient admissible evidence showing damages resulting

from the alleged breaches of contract, such as the value of Allred Metal to Loadman or the amount of profit he expected to earn at closing, Banco is entitled to summary judgment as to plaintiffs' breach of contract claims. *Beemes*, 102 Ohio App. 3d at 789-90; Fed. R. Civ. P. 56(c)(1)(B) and (e).

### D.  Plaintiffs' Oral Contract Claim is Barred by Ohio's Statute of Frauds

Even if plaintiffs had presented sufficient admissible evidence to create a genuine issue of material fact regarding expectation or lost profit damages, their claim for breach of an oral contract fails for the additional reason that it is barred by Ohio's statute of frauds. Ohio Rev. Code § 1335.02(B) states that "[n]o party to a loan agreement may bring an action on a loan agreement unless the agreement is in *writing* and is signed by the party against whom the action is brought or by the authorized representative of the party against whom the action is brought." Ohio Rev. Code § 1335.02(B) (emphasis added). Ohio Rev. Code § 1335.02(C) further states:

> [t]he terms of a loan agreement subject to this section, including the rights and obligations of the parties to the loan agreement, shall be determined solely from the written loan agreement, and shall not be varied by any oral agreements that are made or discussions that occur before or contemporaneously with the execution of the loan agreement. Any prior oral agreements between the parties are superseded by the loan agreement.

Ohio Rev. Code § 1335.02(C).

Count 1(A) of the first amended complaint alleges that Banco entered into an enforceable oral contract to loan Loadman the money to purchase Allred Metal without "undue delay," except if "something extraordinary were uncovered in due diligence." (Doc. No. 19 at 155-56.) In exchange for this oral promise, Loadman ostensibly agreed to forgo seeking financing from Community South or any other lender, purportedly losing the $15,000.00 he paid in fees to Community South. Plaintiffs allege Banco assured Loadman that the environmental

16

issues were routine and not extraordinary and, therefore, Banco was contractually obligated to make a loan agreement with Loadman and its refusal to do so was a breach of the parties' oral contract.[17]

Plaintiffs argue without citation that the statute of frauds does not apply to loan "commitment letters," which they contend are not "loan agreements," and that the foregoing oral promise is thus enforceable. However, the definition of "loan agreement" contained in § 1335.02(A)(3) expressly includes "commitments":

> "Loan agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, mortgages, or other documents or *commitments*, or any combination of these documents or *commitments*, pursuant to which a financial institution loans or delays, or agrees to loan or delay, repayment of money, goods, or anything of value, or otherwise extends credit or makes a financial accommodation.

Ohio Rev. Code § 1335.02 (emphasis added). Here, the alleged oral promise predates the commitment letter and seeks to vary its terms by adding a provision that Banco would expedite the loan process in exchange for the exclusive right to lend the money and, therefore, the alleged oral agreement is superseded by the commitment letter. Accordingly, pursuant to § 1335.02(C), plaintiffs' claim is statutorily barred.

Even if this claim were not barred by the statute of frauds, it fails for the additional reasons raised by defendant. First, plaintiffs have failed to present any evidence that the purported oral contract was ever even formed. In fact, Coco testified at his deposition that "everybody knew" that Wojtowicz had no authority to make lending decisions for Banco (Doc. No. 39 at 1215, 1224), and Loadman testified that he had "no idea" who was ultimately

---

[17] Count 1(B) alleges the existence of an additional oral contract created by representations made by Banco's outside counsel. Plaintiffs have consented to summary judgment on this claim. However, even if they had not consented to summary judgment on this claim, it would also be barred by the statute of frauds for the reasons discussed *infra*.

responsible for approving the SBA loans (Doc. No. 37 at 743-44). Further, any evidence of this alleged oral promise is barred by the parol evidence rule, which "prohibits the consideration of evidence as to anything which happened prior to or simultaneously with the making of a contract which would vary the terms of the agreement." *Hanlin-Rainaldi Const. Corp. v. Jeepers, Inc.*, No. 03AP-851, 2004 WL 2674628, at *5 (Ohio Ct. App. Nov. 23, 2004) (internal quotation marks and citations omitted). Plaintiffs' argument that the commitment letter did not address the terms of the alleged oral contract is unavailing. "Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 53 (1989) (citation omitted).

### E. Plaintiffs' Promissory Estoppel Claim is Barred by the Existence of a Written Contract

In the alternative, plaintiffs seek to enforce the same oral exclusivity agreement alleged in Count 1(A) under a promissory estoppel theory. Additionally, in their brief in opposition to summary judgment, plaintiffs now assert Loadman relied on promises relative to "Banco's expectations about acceptable old-gas station Phase II problems." (Doc. No. 45 at 1453.)

To establish a claim for promissory estoppel under Ohio law, a plaintiff must establish the existence of a clear and unambiguous promise upon which it would be reasonable and foreseeable to rely and actual reliance on the promise to the detriment of one who relied. *Cox v. True N. Energy*, 524 F. Supp. 2d 927, 946 (N.D. Ohio 2007); *Patrick v. Painesville Commer. Props.*, 123 Ohio App. 3d 575, 583 (Ohio Ct. App. 1997). However, "Ohio law bars a promissory estoppel claim when there is an express contract between the parties." *Keating v. Am.'s Wholesale Lender*, No. 1:11 CV 593, 2011 WL 2471732, at *4 (N.D. Ohio June 21, 2011)

18

(citing *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335 (1954)). "Promisory [*sic*] estoppel is not available as a remedy where the legal relationship between the parties is governed by a valid and enforceable contract." *Id.* (citations omitted). Here, the existence of a written contract (the loan commitment letter) bars plaintiffs' promissory estoppel claim.

Moreover, plaintiffs cannot circumvent the statute of frauds by recharacterizing their claim as one for promissory estoppel:

> [Ohio] [c]ourts generally apply the promissory-estoppel exception to the statute of frauds defense only in narrow circumstances. In addition to asserting the claim as a separate cause of action, in order for promissory estoppel to apply, there must be either a misrepresentation that the statute of fraud's requirements have been complied with or a promise to make a memorandum of the agreement.

*HAD Enters. v. Galloway*, 192 Ohio App. 3d 133, 145 (Ohio Ct. App. 2011) (internal quotation marks and citations omitted). Plaintiffs have neither alleged nor put forth sufficient, competent evidence that either occurred in this case. Accordingly, defendant is entitled to summary judgment on plaintiffs' promissory estoppel claim.

## F. Breach of Fiduciary Duty

Plaintiffs' opposition brief to summary judgment argues their breach of fiduciary duty claim should also survive summary judgment. A review of the first amended complaint, however, reveals plaintiffs alleged no such claim; further, there is nothing in their complaint to put defendant on notice of such a claim. Plaintiffs cannot expand their claims at the summary judgment stage to assert new theories of recovery. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). "A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend

19

the complaint in accordance with Rule 15(a)." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (internal quotation marks and citation omitted). Plaintiffs "had the information on which to base these claims in [their] initial Complaint, or [they] could have amended [their] complaint early on in this litigation," and, therefore, the Court may properly refuse to consider plaintiffs' breach of fiduciary duty claim. *Id.* (citations omitted); *see also Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (affirming the district court's refusal to consider a new claim raised for the first time on summary judgment because the plaintiff had been "free to seek leave to amend her complaint").

## III.    CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment (Doc. No. 35) is **GRANTED**, and this case is **DISMISSED**.[18]

**IT IS SO ORDERED**.

Dated: March 19, 2013

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[18] Defendant's motion for judgment on the pleadings (Doc. No. 61) is therefore **DENIED as MOOT**.